It is noted that at the beginning of oral argument on this matter, plaintiff's counsel raised objection to the appearance of Deputy Commissioner Gregory M. Willis as part of the designated panel to hear this appeal. In particular, plaintiff counsel asserted that the Chairman of the Industrial Commission lacks the authority to appoint a Deputy Commissioner to sit as part of the Full Commission except in circumstances where there is a demonstrated unavailability of all remaining Commissioners to sit on a scheduled date.
Plaintiff's objection is duly noted but OVERRULED at this time in the absence of any statutory language explicitly prohibiting such designation of a Deputy Commissioner except in the circumstance noted above.
The undersigned have reviewed the Award based upon the record of the proceedings before the Deputy Commissioner.
The appealing party has shown good grounds to reconsider the evidence. However, upon reconsideration of the evidence, the undersigned reach the same facts and conclusions as those reached by the Deputy Commissioner. Neither party here requested the Full Commission to receive further evidence or to rehear the parties or their representatives. The Full Commission, in their discretion, have determined that there are no good grounds in this case to receive further evidence or to rehear the parties or their representatives, as sufficient convincing evidence exists in the record to support their findings of fact, conclusions of law, and ultimate award.
Accordingly, the Full Commission find as fact and conclude as matters of law the following, which were entered into by the parties as
STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter in this case and the parties were properly before the Industrial Commission.
2. At all time pertinent hereto there was any employee-employer relationship between plaintiff and defendant.
3. Defendant is self-insured pursuant to the provisions of the North Carolina Workers' Compensation Act.
* * * * * * * * * * *
The parties submitted into evidence Stipulated Joint Exhibits ("JX") Nos. 1-14 which include plaintiff's medical records from the following health care providers: (1) Health Services Department, North Carolina Department of Corrections; (2) Dr. Robert W. Elkins, orthopedic surgeon; (3) Morehead Memorial Hospital; and (4) Dr. Mohammad Anwar. Records from plaintiff's treatment by Dr. Stephen Robinson are attached as exhibits to his deposition and are marked Plaintiff's Exhibits ("Pl.'s Ex.") A-D. Plaintiff's employment resume and the records of Dr. H. Gray Broughton ("Mr. Broughton"), plaintiff's vocational rehabilitation counselor, were entered into evidence at the initial hearing of this matter and are marked as Defendant's Exhibits ("Def.'s Ex.") 1-2.
The Full Commission adopt as their own all findings of fact found by the Deputy Commissioner, with minor technical modifications, as follows:
Based upon the competent and convincing evidence adduced at the hearing, the undersigned make the following additional
FINDINGS OF FACT
1. On October 23, 1990, the Industrial Commission approved a Form 21 Agreement entered between plaintiff and FCI, pursuant to which FCI agreed to pay for injuries sustained by accident arising out of and in the course of her employment on January 17, 1990. Subsequently, plaintiff and FCI entered a Form 26 Agreement.
2. On March 23, 1993, FCI filed a Form 24 application on the grounds that the "medical findings and inability to work" were not related to plaintiff's work injury and that plaintiff "was released to return to work but refused to pursue vocational help, claiming medical complications that Dr. Robinson [her neurosurgeon] does not relate to this claim." FCI's Form 24 application was denied on March 24, 1993.
3. Pursuant to the Form 21 and 26 Agreements, FCI has paid plaintiff temporary total disability at the rate of $170.00 per week from February 10, 1990, through May 13, 1991, and from June 5, 1991, until May 17, 1993.
4. Plaintiff had a pre-existing back problem as revealed by the lack of reflexes on her initial physical exam conducted by FCI nurse, Ann Hall and previous treatments for back pain at Morehead Memorial Hospital.
5. On January 17, 1990, plaintiff "jerked" her back and thereafter experienced back pain while pushing blankets into a folding bin. Plaintiff visited the emergency room at Morehead Memorial Hospital on January 22, 1990, complaining of "pain in the lower left side of her back radiating into leg, started 3 days ago." Plaintiff's last day of employment at FCI was February 9, 1990.
6. On February 22, 1990, plaintiff consulted Dr. Robert W. Elkins, an orthopedic surgeon, who concluded that plaintiff had a herniated disc at the L4-5 level. On May 10, 1990, plaintiff sought a second opinion from Dr. Stephen Robinson, a neurosurgeon with Guilford Neurological Associates, who likewise concluded that plaintiff had a herniated disc at the L4-5 level on the left.
7. On July 20, 1990, plaintiff underwent a hemilaminectomy of a herniated nucleus pulposa at the L4-5 level. Plaintiff had a lengthy and somewhat complicated recovery, with numerous complaints of pain and no objective confirmation to support plaintiff's complaints. Dr. Robinson concluded that the course of her recovery after her first operation in July of 1991 was complicated by substantial episodes that he felt were clearly hysterical in nature and had a tremendous psychosomatic overlay. Dr. Robinson ultimately released plaintiff to return to work as of February 14, 1991, with the restriction that she lift no more than fifty (50) pounds.
8. After her release to return to work in February, 1991, plaintiff began work as a vacuum cleaner sales person at Kirby Vacuum Cleaner Sales on May 14, 1991. FCI had paid temporary total disability to plaintiff at the rate of $170.00 per week during the entire period of her absence from work.
9. On June 27, 1991, plaintiff again consulted Dr. Robinson complaining of pain in her left leg. Dr. Robinson ordered a myelogram and post-myelogram CT scan of plaintiff's lumbar spine. On July 23, 1991, Dr. Robinson determined that plaintiff had suffered a recurrent disc herniation at the L4-5 level.
10. Plaintiff underwent a second hemilaminectomy on July 25, 1991. FCI paid temporary total disability compensation to plaintiff at the rate of $170.00 per week from June 5, 1991, until May 17, 1993.
11. After plaintiff was released to return to work on October 15, 1991, FCI retained Gray Broughton, a vocational placement counselor, to assist plaintiff in obtaining employment within her work restrictions. Mr. Broughton first met with plaintiff on February 11, 1992. During the initial interview, Mr. Broughton gathered information regarding plaintiff's educational background, work history, and skills.
12. Thereafter, Mr. Broughton scheduled eleven (11) job search appointments with plaintiff. The majority of these appointments were cancelled by plaintiff for various reasons. Despite her difficulty in making and keeping job search appointments, plaintiff was able to fill out applications at hotels for the position of desk clerk. On or about September 10, 1992, plaintiff was interviewed by Mark Alston, manager of Red Roof Inn, for a desk clerk job pursuant to an application she had filed in July 1992. The job prospects appeared very promising. However, plaintiff sabotaged that employment opportunity by telling Mr. Alston and Mr. Broughton that she had been put on bed rest by Dr. Robinson. This was not true.
13. Despite the fact that she had remained unemployed, plaintiff had not sought treatment by Dr. Robinson since he released her to return to work on October 15, 1991. On September 9, 1992, almost a year after her last treatment and around the time she was first interviewed by Mr. Alston at Red Roof Inn, plaintiff consulted Dr. Robinson by telephone complaining of recurrent pain in her legs. On September 11, 1992, Dr. Robinson examined plaintiff and noted his impression that plaintiff was experiencing recurrent low back and left leg pain, etiology unknown; post lumbar laminectomy, L4-5, left, July of 1990 and July of 1991.
14. Dr. Robinson ordered lumbar spine x-rays and a follow-up MRI. The results of those studies conducted on September 11, 1992, were negative. No further neurological evaluation or treatment was warranted. Dr. Robinson so informed plaintiff on September 16, 1992.
15. Despite the fact that Dr. Robinson had reevaluated plaintiff in early September 1992 and found no reason why she could not work within her restrictions, plaintiff claimed that she remained bedridden throughout October 1992. On October 23, 1992, Dr. Robinson reevaluated plaintiff because she was still complaining of significant pain in her left leg. Dr. Robinson concluded that her pain was of unknown etiology, but because her pain was persistent, he ordered a myelogram and post-myelogram CT scan. The October 23, 1992, diagnostic studies showed no evidence of a significant disc herniation or nerve root compression.
16. Dr. Robinson concluded that the emotional overlay to plaintiff's back injury continued subsequent to her second back surgery in July of 1991. Based on the September and October 1992 tests, Dr. Robinson concluded there was no reason why plaintiff could not work within her restrictions of no frequent bending or lifting and no lifting over twenty (20) pounds.
17. Mr. Broughton continued to contact plaintiff throughout November and December on a weekly basis. In early November, plaintiff was hospitalized for a period of three (3) days for treatment of kidney stones. Later in November 1992 plaintiff told Mr. Broughton that she was unable to look for light duty employment. She informed him that she was bedridden. To confirm this Mr. Broughton contacted Dr. Robinson's office. Dr. Robinson told Mr. Broughton that plaintiff could return to work consistent with her work restrictions.
18. Dr. Robinson also informed Mr. Broughton that despite plaintiff's claims of being bedridden, she was observed marching in the homecoming parade at A T University. In his office note dated November 11, 1992, Dr. Robinson wrote:
 [Plaintiff] called. . .[she] had been observed [by a secretary at Guilford Neurological Associates] during the homecoming parade at A T University in no apparent discomfort intermittently marching backwards at times. When I discussed this with the patient, she said that she did do this, but she was still having significant left leg pain. . . .
In his deposition, Dr. Robinson further stated:
 She was not just marching backwards. She was jumping up and down, waving her hands, obviously in no pain, was not feeling any and had no limitation of motion.
Although she was able to endure her "pain" in order to march in the parade sometime around November 11, 1992, plaintiff declined to go on job interviews with Mr. Broughton throughout December 1992.
19. On January 5, 1993, plaintiff telephoned Dr. Robinson with concerns about her job restrictions and the possibility of working. Dr. Robinson told her that she was capable of work, although she could not do frequent bending or lifting nor should she lift more that twenty (20) pounds. The next day, Mr. Broughton contacted plaintiff. Despite Dr. Robinson's opinion that she was capable of work, plaintiff told Mr. Broughton that she never knew when she would feel like going out on job interviews. Plaintiff did agree to go for job interviews later in January, however, she was unable to do so, because she suffered a new herniated disc at the L5-S1 level as the result of a sneeze.
20. On January 13 and 14, 1993, plaintiff went to the emergency room at Morehead Memorial Hospital complaining of leg pain. On January 15, 1993, plaintiff returned to Dr. Robinson for a follow-up evaluation. During the examination, plaintiff told Dr. Robinson that she recently went through an episode of sneezing and was having recurring radicular pain into her left leg. Dr. Robinson noted that the studies taken in September and October 1992 showed no evidence of recurrent disc herniation. However, in view of her recurrent symptoms, he conducted an MRI to determine whether she had another herniated disc.
21. Eight days later, on January 23, 1993, Mr. Broughton spoke with plaintiff. She told him that Dr. Robinson had performed an MRI and that she was waiting for the results. Upon inquiry, Dr. Robinson informed Mr. Broughton that the MRI showed a new disc herniation at L5-S1 on the left. In a letter dated February 2, 1993, Dr. Robinson wrote that he did not feel that plaintiff could return to work at that time although he did not recommend that plaintiff undergo a third back surgery because of her continuing obesity.
22. Plaintiff was convicted of obtaining property on false pretenses and was placed in the North Carolina Correctional Institute for Women on March 25, 1993. Plaintiff was released from prison on August 1, 1993.
23. While in CIW, plaintiff was treated for back and leg pain. She did not consult Dr. Robinson again until September 20, 1993, — more than a month after her release from prison and nine (9) months after he diagnosed the new herniated disc at L5-S1. At that time, plaintiff complained of pain in her right leg, whereas all prior complaints had been of pain in her left leg.
24. Dr. Robinson's impression was "intermittent right leg pain, probably secondary to lumbar disc disease; post lumbar laminectomies of L4-5, left, July of 1990 and July of 1992; HNP of L5-S1, left (unoperated)." Dr. Robinson recommended no further neurological evaluation or treatment. Dr. Robinson instructed plaintiff to call him if her pain worsened, and she had not contacted him as of the time of his September 30, 1993 deposition.
25. Plaintiff was employed with Kirby Vacuum Cleaner Sales until June 4, 1991, — a period of almost one (1) month — when she began experiencing back problems related to her second herniation at the L4-5 level. Upon her release to return to work on October 15, 1991, after her second back surgery, Dr. Robinson instructed her to obtain assistance in carrying the vacuum cleaners. He did not instruct plaintiff to give up her job as a salesperson. However, plaintiff did not return to her sales job.
26. Plaintiff worked for two (2) days as a telemarketer. She obtained that position from a list of jobs provided by Mr. Broughton. Plaintiff testified that her telemarketing job lasted two (2) days at which time she was terminated because she could not sit. Mr. Broughton was not aware that plaintiff had been hired as a telemarketer. If he had known that plaintiff had this particular job, he would have talked to the employer about accommodating her need to alternately sit and stand. Mr. Broughton explained that if an employer could make this accommodation for her, he thought the employer would have a really good employee.
27. As of the date of the hearing, plaintiff had obtained no other employment since her injury. Plaintiff offered no testimony regarding her search for employment except the testimony of Mr. Broughton regarding the applications she made in his presence.
28. Throughout plaintiff's employment history, she has held a wide variety of jobs (gardener, cashier, waitress, stock clerk, jewelry assembler, private duty nurse, textile worker), most of which have been for short periods of time.
29. Plaintiff has been heavy all her life. On July 28, 1989, prior to her employment at FCI, plaintiff underwent an intake examination conducted by Ms. Hall, an occupational health nurse with FCI. During that examination, Ms. Hall recorded that plaintiff weighed 247 pounds.
30. After her first back surgery in July 1990, plaintiff was discharged from the hospital on a weight loss program which included a low calorie diet and walking regime. Plaintiff was able to lose several pounds in the month after her discharge. In September 1992 Dr. Robinson reexamined plaintiff. Plaintiff told Dr. Robinson that she had lost about seven (7) pounds since he last saw her on October 2, 1991, although she still weighed between 260-270. On August 2, 1993, plaintiff was five (5) feet and five and one-half (5 1/2) inches tall and weighed 271-272 pounds.
31. In Dr. Robinson's opinion, plaintiff's second herniation at the L4-5 level and her second back surgery were related to her first herniation at the L4-5 level on the left.
32. Plaintiff reached the end of her healing period and was at maximum medical improvement with regard to her L4-5 disc herniation surgeries as of mid-October of 1991, when Dr. Robinson authorized her to return to work.
33. Plaintiff's condition was not significantly different in October 1992.
34. Plaintiff's third herniated disc is totally unrelated toher prior herniations at the L4-5 level.
35. In Dr. Robinson's most recent examination of plaintiff on September 20, 1993, he didn't feel that she really had significant problems. He recommended no further neurological evaluation or treatments. In his opinion her problems were mainly psychosomatic.
36. Based on his last examination of plaintiff on September 20, 1993, Dr. Robinson felt that plaintiff was capable of some work within the restrictions of no frequent bending or lifting and no lifting more than twenty (20) pounds. Dr. Robinson felt that in his opinion plaintiff could handle a telemarketing job if she were able to alternate sitting and standing.
37. Dr. Robinson gave plaintiff a fifteen (15) percent permanent partial disability rating on her back.
38. Dr. Robinson gave plaintiff a prescription for the professional weight loss program in October of 1991, because he suspected that "she wanted to try to get insurance coverage, and you have to have a physician say that you have morbid obesity in order to try and get the insurance company to pay for it." He described plaintiff as morbidly obese and that a weight loss would be preventative of further back problems and good for plaintiff's general health. However, he did not believe that she had the self discipline to lose weight.
39. In Mr. Broughton's opinion, plaintiff had more transferrable skills than anyone that he had worked with in a long time. Plaintiff should have no trouble getting a job. She presents herself well. She has a quick mind and is pleasant to work with. She finished high school and went to Rockingham Community College and received an Associate Communication Degree, and certification as a geriatric nursing assistant, attending college from 1980 to 1985. Plaintiff is articulate and should be able to get a job in customer service dealing with the public, a desk clerk job, a front desk manager, or other such jobs.
40. Mr. Broughton believes that, based upon her education, skills, and other qualifications, plaintiff should have been able to get a job as of July of 1992, except for the economy and other problems unrelated to her ability to get a job. Mr. Broughton characterized the economic conditions of Rockingham County as difficult, but there are jobs out there for someone who will cooperate.
41. Plaintiff has not been cooperative on a consistent basis.
42. Plaintiff's obesity is a pre-existing condition which was neither caused by nor aggravated by a work related injury. As such, defendant is not liable for payment for a weight loss program. Additionally, plaintiff has previously participated in weight loss programs without success. It is unlikely that plaintiff would significantly benefit from such a program due to lack of self discipline in this area.
43. Plaintiff reached maximum medical improvement from her January 17, 1990, injury on October 30, 1992. She has a fifteen (15) percent permanent partial impairment to her back as a result of her injury and two (2) surgeries.
44. Plaintiff was able to return to work as of October 30, 1992.
45. Any further medical treatment of plaintiff after October 30, 1992, was either for problems unrelated to her work injury, or was not reasonably medically necessary to effect a cure or give relief from the work related injury.
46. Defendant has paid weekly benefits of $170.00 per week from October 31, 1992, through May 17, 1993. Defendant shall be entitled to a credit against the permanent partial impairment award due for the fifteen (15) percent rating to her back. Thus defendant shall be entitled to a credit for twenty-eight (28) and three sevenths (3/7) weeks, the benefits which have already been paid.
* * * * * * * * * * *
Based upon the findings of fact as found by the Deputy Commissioner and adopted by the Full Commission, the Full Commission find as follows:
CONCLUSIONS OF LAW
1. Plaintiff is not entitled to any additional benefits for temporary total disability. N.C. Gen. Stat. § 97-29. Plaintiff has reached the end of her healing period and, to the extent she has been unemployable, such was due to either unrelated medical and personal problems, or to her criminal conviction and jail sentence.
2. Plaintiff reached maximum medical improvement from her January 17, 1990, injury on October 30, 1992. She has a fifteen (15) percent permanent partial impairment to her back as the result of her injury and two (2) surgeries. She is entitled to forty-five (45) weeks of compensation in payment of the fifteen (15) percent impairment rating.
3. Plaintiff is entitled to such medical treatment as may be related to the compensable injury, provided such treatment effects a cure, gives relief, or lessens the period of disability.Hyler v. GTE Products Co., 331 N.C. 554, 417, S.E.2d 802 (1992).
4. Defendant is entitled to a credit against the permanent partial impairment award for the twenty-eight (28) and three sevenths (3/7) weeks of weekly benefits previously paid from October 31, 1992, through May 17, 1993.
* * * * * * * * * * *
The foregoing stipulations, findings of fact, and conclusions of law engender the following:
AWARD
1. Defendant shall pay plaintiff weekly benefits at the rate of $170.00 per week for sixteen (16) and four sevenths (4/7) weeks. Said amount already having accrued, the defendant shall pay this amount in a lump sum.
2. Plaintiff's attorney is entitled to a fee of twenty-five (25) percent of the compensation awarded herein, which amount shall be deducted from the aforesaid award and paid directly to plaintiff's counsel.
3. Defendant shall pay the costs due the Commission.
IT IS FURTHER ORDERED that this case be REMOVED from the Full Commission hearing docket.
This the __________ day of ________________________, 1995.
 S/ _________________________ J. HOWARD BUNN, JR. CHAIRMAN
CONCURRING:
S/ _________________________ J. RANDOLPH WARD COMMISSIONER
S/ _________________________ GREGORY M. WILLIS DEPUTY COMMISSIONER
JHB/nwm